**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CAROLYN ZALEPA                          :
        Plaintiff                  :
  v.                                       :      3:CV-03-1850
                                                                     :      (CHIEF JUDGE VANASKIE)
CORNERSTONE TECHNOLOGIES, LLC.    :
        Defendant                 :

## MEMORANDUM

Carolyn Zalepa has brought this action against defendant Cornerstone Technologies, LLC., ("Cornerstone"), to pursue alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955(a). Ms. Zalepa, while conceding that she is not disabled, asserts that Cornerstone fired her because its decision-makers regarded her multiple sclerosis as substantially limiting her ability to work. Cornerstone has moved for summary judgment, alleging that Zalepa cannot establish a prima facie case of employment discrimination. Cornerstone alternatively contends that it is at least entitled to summary judgment on the PHRA claim since it was not filed timely. Because Zalepa has failed to present evidence sufficient to create an inference that Cornerstone perceived her as disabled, and thus cannot establish a prima facie case of disability discrimination, Cornerstone's summary judgment motion will be granted.

## I. BACKGROUND

Carolyn Zalepa, who has multiple sclerosis (MS), was hired by the defendant in January of 2000 to work as a laboratory technician. (Zalepa Dep., Dkt. Entry 23 at 14.) In March of 2000, Zalepa was promoted to laboratory manager upon the hiring of a second laboratory staff person. (Id. at 16, Pl.'s Ex. A, Dkt. Entry 24 at 2.) As a laboratory manager, Zalepa reported to Paul Kanjorski, Vice President of Operations, and Yvonne Spooner, Vice President of Marketing. (Pl.'s Ex. A, Dkt. Entry 24 at 2.) Over the course of her employment at Cornerstone, Zalepa saw her compensation increase.

As a laboratory manager, Zalepa's duties included writing standard operating procedures and running laboratory tests. (Zalepa Dep., Dkt. Entry 23 at 63.) In early 2002, Spooner, Zalepa's immediate supervisor, assigned her to conduct patent research involving the review and study of scientific journals. (Id. at 63-66.) Zalepa states that she had no problems with either the physical or mental demands of the job. (Id. at 55-57.)

Although Zalepa had MS, she felt that she was able to perform her job without any modification in work requirements. (Zalepa Dep., Dkt. Entry 25 at 67.) Throughout her employment at Cornerstone, from January of 2000 to May of 2002, not once did Zalepa request any accommodations for her medical condition. (Id.)

Zalepa spoke openly about her MS, and, by her own account, everyone knew of her condition. (Zalepa Dep., Dkt. Entry 25 at 61-62.) Moreover, in September of 2000, Zalepa

communicated to the President of Cornerstone, Bruce Conrad, that she had MS.  (Id. at 60-61.)

In June, September, and October of 2000, Zalepa was hospitalized for kidney infections attributable to MS.  In each instance, Kanjorski requested that Zalepa submit a medical explanation.  (Id. at 67.)  Zalepa was the only employee to have ever been required to submit a medical explanation for the use of sick leave.  (Pl.'s Suppl. Interrogs., Dkt. Entry 25 at 2.)    In May of 2002, Zalepa experienced difficulty with MS, feeling "very fatigued and tired."  (Zalepa Dep., Dkt. Entry 25 at 18.)  As a result, Zalepa attended several doctors' appointments during normal business hours.  (Id.)

In a May 16, 2002 email, Spooner expressed concern that Zalepa was away from the office so often for her doctors' appointments and that she was being paid for forty hours a week even though she had not made up for her missed time.  (Zalepa Dep., Def.'s Ex. 2, Dkt. Entry 25 at 2.)  Spooner further stated:

> I am compassionate to your condition, however, you have a job with
> certain responsibilities and certain time constraints. If you are unable to
> perform your duties, we can discuss reassignment; if you need a flexible
> schedule to accommodate your appointments, I have never been opposed
> to that and you have never requested that as an option.

Spooner also expressed displeasure at the tone of an earlier email message from Zalepa, and indicated that she would discuss the matter with Zalepa at greater length when she was at the Cornerstone facility the following week.  (Id.)

Zalepa responded to this email in a way that offended Zalepa.  The next day, May 17th,

3

Spooner emailed Zalepa again, stating:

> The tone and nature of your reply is inappropriate. The ugliness stops here and I feel vexed that it has gone too far. I will be in town next week and we will need to meet . . . to discuss how I intend to handle this in the future. You definitely have an attitude issue in dealing with responsibility and you choose poorly as to who is copied on your correspondence – Ray has no business seeing you behaving this way and you have left me no choice other than some form of disciplinary action. Carolyn, we discussed the button pushing on a phone call before and you persist. As for your doctor appointments, you have had many more than one in the last two months. As per a memo that you should have signed and returned . . ., you agreed that personal time is approved time off – I have not signed any such requests from you. Asking Paul to do so as to bypass my authority is not acceptable and will be denied in the future! Sara does not check your time sheet, and your behavior toward her is part of what has prompted this issue. The chip on your shoulder needs to go. You have not been singled out, that is your perception and it is not your business who else has been talked to regarding hours. . . . I have attempted to mentor you and provide new opportunities, some of which you have risen to the occasion and others that I have deemed you unable to fulfill. If you question my intentions, make no mistake at this point – they are to develop your professional career while maintaining the best interests of the company . . . . Do not further complicate the issue by continuing on this current path, rather do your job and stop spending time and energy, including my own, on this matter until next week. There is nothing personal in this issue toward you and you must stop believing it to be so!   . . .
>
>     Think very carefully before you choose a battle and make absolutely certain that you are in the right before you move forward. This is the end of this until we meet next week. If I come into the facility to a place full of frowns due to the unfair treatment that you perceive that you are receiving that will further create problems. From this point forward, these issues are between you and me. Paul and Patti are appropriate as well – do not further entangle or influence other employees. If you are indeed doing a good job to the best of your abilities, then issues regarding time cards are easily handled as are issues involving orders. When you

>choose to pursue the path that you have, you have created an adversarial relationship that is unproductive, and therefore, casts a bad image.
>
>Carolyn, I believe that you have a great deal to offer the company and the world in general but I do not coddle and do not accept excuses.

(Zalepa Dep., Def.'s Ex. 1, Dkt. Entry 25.)

On May 23, 2002, a week after Spooner's May 16th email, Cornerstone terminated Zalepa's employment as a laboratory manager, citing insubordination. (Pl.'s Ex. A, Dkt. Entry 24 at 2, Zalepa Decl., Dkt. Entry 27 at 2.) Zalepa, complaining that the true reason she was fired was her disability, filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") on November 23, 2002, more than 180 days after her May 23, 2002 discharge. (Zalepa Decl., Ex. 1, Dkt. Entry 27.) After receiving a right to sue notice, Zalepa brought this action on October 16, 2003. (Complaint, Dkt. Entry 1.)

## II. DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby

Inc., 477 U.S. 242, 248 (1986).  "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir.), cert. denied, 513 U.S. 1022 (1994).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 329 (1986).  All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  Continental Ins. Co. v. Bodie, 682 F.2d 436 (3d Cir. 1982).  Once the moving party has satisfied its burden, the nonmoving party, "must present affirmative evidence to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 256-57.  Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials.  Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

To establish a prima facie case of discrimination under the ADA, it is incumbent upon

Zalepa to present evidence that: (1) she has a "disability" within the meaning of the ADA; (2) she was qualified for her position, with or without accommodation; and (3) she suffered an adverse employment decision as a result of the discrimination. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000); Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998)(en banc).

> A "disability" is defined by the ADA as:
>
> > (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual
> > (B) a record of such an impairment; or
> > (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Accordingly, to fall within this definition, one must have an actual disability (subsection A), have a record of a disability (subsection B), or be regarded as having one (subsection C)." Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999).

A "physical or mental impairment" for purposes of the ADA has been defined to include a "physiological disorder or condition . . . affecting one or more of the following systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), [and] cardiovascular . . . ." 29 C.F.R. § 1630.2(h)(1). "Substantially limits" has been defined as, among other things, an inability "to perform a major life activity the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition under which the average person in the general population can perform that same

major life activity." 29 C.F.R. § 1630.2(j)(1). "Major life activities" include "walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).

Zalepa does not contend that her multiple sclerosis substantially limits any of life's major activities. Nor does she assert that she has a record of such an impairment, i.e., that she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. 1630.2(k). What she does claim is that Cornerstone perceived her to be disabled as a result of her multiple sclerosis.

A person is "regarded as" having a disability if that person:

(1) has a physical impairment that does not substantially limit major life activities but is treated by the defendant as substantially limiting a major life activity;

(2) has a physical impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or

(3) has no impairment at all but is nonetheless treated by the defendant as having a substantially limiting impairment. See Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3d Cir. 1999); 29 C.F.R. § 1630.2(l). As Justice O'Connor explained in Sutton, 527 U.S. at 489, the "regarded as disabled" component of the definition of a disability requires that a defendant "entertain misperceptions about the individual – he must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'resul[t]

from stereotypic assumptions not truly indicative of . . . individual ability.'"

In a "regarded as" case, such as this one, the analysis "focuses not on [plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him." Kelly v. Drexel University, 94 F.3d 102, 108-09 (3d Cir. 1996). The test, moreover, is not whether the employer harbored some unsubstantiated bias with respect to the employee's actual or perceived impairment; instead, the question is whether the employer "treated plaintiff adversely because it regarded him as having an impairment that substantially limits one or more major life activities." Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999), cert. denied, 528 U.S. 1078 (2000). "Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment . . . are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." Sutton, 527 U.S. at 490-91.

At this stage of this case, it is incumbent upon Zalepa to present some evidence supporting a rational inference that Cornerstone regarded Zalepa's multiple sclerosis as substantially limiting a major life activity. Zalepa suggests that the major life activity that Cornerstone perceived to be limited by Zalepa's multiple sclerosis was "working."

"[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." Murphy v. United Parcel Service, Inc., 527 U.S. 516, 523 (1999). In other words, there must be evidence from which it may logically

be inferred that Cornerstone perceived Zalepa's multiple sclerosis as significantly restricting her ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I). See also Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001). Zalepa does not cite any evidence that Cornerstone's decision-makers held such a view.

Thus, this is not a case like Deane v. Pocono Medical Center, 142 F.3d 138 (3d Cir. 1998), where there was evidence that the employer had come to the conclusion, albeit erroneous, that a wrist injury substantially limited what the plaintiff could do and a vocational expert explained the import of the erroneous perception insofar as the employability of the employee was concerned. Nor is this the kind of case contemplated in 29 C.F.R. Pt. 1630 app. § 1630.2(l), indicating that a "regarded as" disabled employee may be a person with hypertension who is reassigned to less strenuous work because of the employer's unsubstantiated fear that the person will suffer a heart attack. There is simply no evidence in this case that Cornerstone reduced Zalepa's responsibilities or limited her work because of some unsubstantiated concern for her health.

On the contrary, the undisputed evidence is that several months prior to Zalepa's discharge, Cornerstone expanded her responsibilities and work requirements. The fact that an employer increases an employee's work requirements cannot logically support a rational inference that the employer perceived the employee to be substantially limited in the major life

activity of working.  See Penchishen v. Stroh Brewery Co., 932 F.Supp. 671, 675 (E.D. Pa. 1996)(summary judgment granted on ADA claim where plaintiff given job assignments that required substantial walking notwithstanding her leg injury because such evidence "tends to show that Defendant did not perceive Plaintiff as substantially limited in the activities of walking or working . . ."), aff'd mem., 116 F.3d 469 (3d Cir.), cert. denied, 522 U.S. 868 (1997). At her deposition, Zalepa conceded that Spooner "probably" assigned the patent research project to her in early 2002 because she thought Zalepa was capable of carrying out the task. (Zalepa Dep., Dkt. Entry 23 at 66.)

Zalepa believes her multiple sclerosis condition to be the sole reason for her termination. (Zalepa Dep., Dkt. Entry 25 at 18.)  The principal basis upon which Zalepa supports this claim are emails from Spooner, particularly those dated May 16 and 17, 2002.  Zalepa asserts that Spooner gave her "a hard time" with her "critical," "unapproachable," and "hostile" emails. (Id. at 7.)  Zalepa further contends that Spooner's messages reflect a perception that MS rendered Zalepa unable to discharge her job requirements.

In the May 16th email, Spooner did express displeasure with Zalepa not working the forty hours expected of her.  (Zalepa Dep., Def.'s Ex. 2., Dkt. Entry 25 at 2.)  Moreover, she indicated that if Zalepa was unable to perform her job duties, a reassignment could be discussed.  (Id.)  In this regard, Spooner suggested consideration of a flexible schedule to accommodate Zalepa's medical appointments.  (Id.)  Nowhere in her messages, however, did

Spooner indicate that she regarded Zalepa's multiple sclerosis as substantially limiting her ability to work. Nor can they be construed as such. See Parker v. Port Authority of Allegheny County, 90 Fed. Appx. 600, 604 (3d Cir. 2004) (statement that plaintiff could not handle "the stress that goes along with the job" would not support inference that employer regarded plaintiff to be substantially limited in working). Spooner's issue was not with Zalepa's capabilities, but rather with the fact that she was away from her office during regular working hours and that she did not make up for her missed time. At best, an inference can be drawn from Spooner's emails that Cornerstone did not want to compensate persons from time away from the office during regular working hours, even if it were for doctors' appointments. The messages, however, do not reveal an attitude that persons with multiple sclerosis are incapable of working or substantially limited in work activities. What Spooner's messages do disclose is displeasure with what Spooner perceived to be an insubordinate and hostile reaction by Zalepa to the matter of her absences from work. Although Zalepa contends that Kanjorski had suggested to her that she could use "comp time" for her medical appointments, in contrast to Spooner's position, this matter has no bearing on the question of whether Cornerstone regarded Zalepa as disabled under the ADA. (Zalepa Decl., Dkt. Entry 27 at 2.)

    In Zapela's "Charge of Discrimination" filed with the EEOC and PHRC, she advances her claim of disability discrimination by asserting that Kanjorski asked her if she was "really sick" and requested notes from her physician. (Pl.'s Ex. A, Dkt. Entry 24 at 2.) Indeed, Kanjorski

requested Zalepa to submit a medical explanation for her three hospitalizations in 2000 caused by kidney infections. Moreover, according to Cornerstone personnel files, she is the only employee to ever have been required to submit a medical excuse for the use of sick leave. (Pl's Supp. Interrogs., Dkt. Entry 25 at 2.) While Kanjorski's repeated requests for a medical explanation may diverge from Cornerstone's standard protocol, they do not in any way indicate that he or Cornerstone perceived Zalepa to be substantially limited in her ability to work. See Tice, 247 F.3d at 515-16 (requests for medical information may suggest that defendant had doubts with respect to employee's ability to perform a particular job, but do not support an inference that defendant regarded plaintiff to be disabled). On the contrary, the inquiries suggest a perception that Zalepa's condition did not warrant her absences from work. In other words, Zalepa's supervisors did not perceive her MS to be substantially limiting when it came to discharging her job duties.

Zalepa has not adduced any competent evidence that any Cornerstone decision-maker regarded her multiple sclerosis as substantially limiting a major life activity. The fact that Zalepa's work performance was satisfactory and she was nonetheless terminated does not suggest that Cornerstone regarded her as disabled. Indeed, "[t]he notion that [defendant] must have fired [plaintiff] because it regarded him as disabled and that it plainly regarded him as disabled because it fired him is attractive but circular -- it lacks a causal antecedent." Harrington v. Rice Lake Weighing Systems, Inc., 122 F.3d 456, 461 (7th Cir. 1997).

Zalepa does not contend that she was substantially limited at work, and the facts are consistent with a conclusion that Zalepa remained fully capable of working. There is, moreover, no evidence that Cornerstone regarded Zalepa as disabled. Because Zalepa has not presented competent evidence to show that she is a person with a "disability" within the coverage of the ADA, Cornerstone is entitled to summary judgment on the disability discrimination claims.[1]

### III. CONCLUSION

For the reasons set forth above, Cornerstone will be granted summary judgment as to Zalepa's claims based upon alleged disability discrimination. An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

---

[1] The analysis of Zalepa's ADA claim is dispositive of her PHRA claim as well. See Parker, 90 Fed. Appx. at 601. Had the ADA claim survived summary judgment, however, Cornerstone would nonetheless be entitled to dismissal of the PHRA claim. Under the PHRA, a claim must be filed within 180 days of the discriminatory act. 43 P.S. § 959(h); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997). Zalepa was discharged on May 23, 2002, but did not submit her PHRA claim until November 23, 2002, more than 180 days after her discharge. Accordingly, the PHRA claim is untimely.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CAROLYN ZALEPA                              :
             **Plaintiff**        :
v.                                          :        3:CV-03-1850
                                    :        (CHIEF JUDGE VANASKIE)
CORNERSTONE TECHNOLOGIES, LLC.              :
             **Defendant**      :

## ORDER

**NOW, THIS 30th DAY OF NOVEMBER, 2005,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment (Dkt. Entry 22) is **GRANTED**.

2. The Clerk of Court is directed to enter judgment in favor of Defendant and to mark this matter **CLOSED**.

                                                **s/ Thomas I. Vanaskie**
                                                Thomas I. Vanaskie, Chief Judge
                                                Middle District of Pennsylvania